**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　　vs.<br><br>SANDRA RODRIGUEZ,<br><br>　　　　　　　　　　Defendant. | Case Nos. 19-CR-3339-LAB<br>　　　　　　　 20-CR-2911-LAB<br><br><br>**ORDER OF RECUSAL IN CASE NOS. 19CR3339 AND 20CR2911** |
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　　vs.<br><br>JESUS EZEQUIEL RODRIGUEZ,<br><br>　　　　　　　　　　Defendant. | |

These two cases—both coincidentally involving unrelated defendants with the surname Rodriguez—have been remanded to this Court by the court of appeals for resentencing.  In both cases, the defendants pled guilty to importing very large amounts of dependency-causing drugs from Mexico into the United States.  In Case No. 19CR3339, Sandra Rodriguez confessed and pled guilty to importing 21.06 kilograms (over 47 pounds) of pure

methamphetamine and 2.24 kilograms (about 5 pounds) of pure heroin.   In Case No. 20CR2911, Jesus Rodriguez admitted he imported 40.48 kilograms (89 pounds) of pure methamphetamine.  Both defendants also acknowledged they had previously imported or trafficked drugs at least one other time.

At their sentencing hearings, I considered and rejected arguments that defendants were "minor participants" in the importation crimes they committed. On appeal, the Ninth Circuit held this determination was error based on a misapplication of § 3B1.2(b) of the United States Sentencing Guidelines ("U.S.S.G.") (listing factors a court should consider in assessing whether a defendant was a minor participant in a crime), vacated the defendants' sentences, and remanded the cases for resentencing.  In Sandra Rodriguez's case, the panel majority (with Judge Lee dissenting) concluded four of five nonexclusive factors under § 3B1.2(b) weighed in favor of finding she was a minor participant in her crimes.  *United States v. Rodriguez* ("S. Rodriguez Mandate")*,* 2021 U.S. App. LEXIS 38134, at *12–13 (9th Cir. Dec. 27, 2022). In Jesus Rodriguez's case, a different panel held I erred by misinterpreting and misapplying three of the five § 3B1.2(b) factors, which the panel said supported a minor role finding.  *United States v. Rodriguez* ("J. Rodriguez Mandate"), 44 F.4th 1229, 1234–37 (9th Cir. 2022).

In the federal system, when a defendant pleads guilty or is convicted after trial, a district judge is obligated to impose a reasonable sentence.  Central to this task is determining the defendant's level of culpability—what his or her role was in the crime.  The Supreme Court has declared that district judges have "special competence" to make this assessment because they typically have thorough knowledge of the facts of the case at hand, are familiar with common offenses and the characteristic ways in which they are committed, and have everyday experience they have gained in handling trials, sentencings, and imposing sentences in similar cases.  *Buford v. United States*, 532 U.S. 59,

64–65 (2001); *see also Koon v. United States*, 518 U.S. 81, 98–99 (1996) (deference to the district court is warranted because factual nuances often closely guide the legal decision, with legal results depending heavily upon an understanding of the significance of case-specific details).  The Sentencing Guidelines aid district judges in making the assessment by providing a list of nonexclusive aggravating and mitigating factors to be considered when deciding what role a defendant played in the criminal activity.

Section 3B1.1, for example, identifies factors that point to an "aggravating role," such as whether the defendant acted as a "leader," "organizer," "manager," or "supervisor" in the offense; exercised authority and control over others; or recruited accomplices.  U.S.S.G. § 3B1.1, comment. (n.4).  Defendants who play an aggravated role in criminal activity face an upward adjustment of their Guidelines of 2–4 levels.

Conversely, § 3B1.2(b) lists five factors that may demonstrate a defendant played only a "minor" role, such as whether the defendant understood the scope of the criminal activity, participated in the planning of the criminal activity, exercised decision-making authority, or stood to benefit from the crime.  U.S.S.G. § 3B1.2, comment. (n.3(C)).  Minor participants are eligible to receive a downward adjustment of their Guidelines of 2–8 levels, depending on the crime.  These factors aren't exhaustive—a judge may consider other factors weighing for or against granting or denying a role reduction.  But all of the § 3B1.2(b) factors should be considered in making the determination. *United States v. Quintero-Leyva*, 823 F.3d 519, 523 (9th Cir. 2016) (district court should consider all § 3B1.2(b) factors, but may grant or deny role reduction even if some factors weigh in favor and others weigh against a minor role finding).  The ultimate question whether to grant or deny minor role is: In light of all the circumstances, has the defendant proved more likely than not that he or she was substantially less culpable than other average participants

in the criminal activity?   U.S.S.G. § 3B1.2, comment. (n.3(A)); *see United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir. 1994) (burden of proof is on defendant to show by a preponderance of the evidence that he or she played a minor role in the offense).

Both Mandates alluded to a possible 2-level reduction under § 3B1.2(b) if the defendants were found to be minor participants.   *See S. Rodriguez Mandate*, 2021 U.S. App. LEXIS 38134, at *8; *J. Rodriguez Mandate*, 44 F.4th at 1222.   These references incompletely describe the extent of the reduction the Rodriguez defendants stood to receive.   Drug smugglers who import more than 4.5 kilograms of methamphetamine, as both Rodriguez defendants did, and who are *not* minor participants in the offense, face a starting Guidelines offense level of 38.   U.S.S.G. § 2D1.1.   The Guidelines then direct the court to impose an additional 2-level increase because methamphetamine is especially harmful and addictive.    U.S.S.G. § 2D1.1(b)(5).    The starting Guidelines offense level of "average" methamphetamine importers is 40.

In contrast, when a drug smuggler is deemed a minor participant, the Guidelines instruct the court to reduce the starting offense level from 38 to 34, and to not apply the 2-level adjustment peculiar to methamphetamine. U.S.S.G.  §  2D1.1(a)(5).    After initially applying this **6-level** downward adjustment, the Guidelines direct the court to apply an additional **2-level** downward adjustment to account for minor role.  U.S.S.G. § 3B1.2(b).  Thus, defendants who smuggle 4.5 kilograms or more of methamphetamine but who are deemed minor participants face a starting offense level of 32 rather than 40.  This amounts to an ***8-level*** decrease in their starting Guidelines offense level.   Without regard to other downward adjustments sentencing courts commonly grant, an 8-level decrease results in a minimum 171-month reduction in sentencing exposure under 21 U.S.C. § 952(a) for defendants who import bulk amounts of drugs.  U.S.S.G. Sent'g Tbl. (suggesting a Guidelines

range of 292–365 months of imprisonment for an Offense Level 40 in Criminal History Category I and 121–151 months for Offense Level 32 in Criminal History Category I).

Despite finding that neither Sandra Rodriguez nor Jesus Rodriguez was a minor participant in their crimes, I sentenced both to prison terms well below the low end of their respective Guidelines ranges.  Sandra Rodriguez, who had no prior criminal record, but who had successfully smuggled a bulk quantity of drugs a week before, was sentenced to 78 months in custody.   Jesus Rodriguez, who had recently served a 7-year prison sentence for felony drug trafficking and was on supervised release for that offense when arrested in this case, was sentenced to 90 months in custody.

The Ninth Circuit's Mandates in the *Rodriguez* cases are "law of the case," which requires me to faithfully adhere to and implement the holdings when resentencing each defendant.  *Sibbald v. United States*, 12 Pet. 488, 492 (1838) (inferior courts are bound by law of the case and must act according to the mandate; they cannot vary from the mandate or examine it for any other purpose than execution or intermeddle with it, "further than to settle so much as has been remanded").  I am also bound by "the rule of mandate," which is similar to, but broader than, the law of the case doctrine.  Under this rule, "[a] district court, upon receiving the mandate of an appellate court cannot vary it or examine it for any other purpose than execution."  *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995).  Emphasizing the breadth of this requirement, the Ninth Circuit has explained that lower courts may not deviate from the terms of the Mandate if the effect of doing so runs "counter to the *spirit* of the circuit court's decision."  *Cassett v. Stewart*, 406 F.3d 614, 621 (9th Cir. 2005) (emphasis added).

Theoretically, adherence to the law of the case and the rule of mandate doctrines should not preordain the sentence the district court must impose on

remand.  *But see United States v. Paul*, 561 F.3d 970, 973 (9th Cir. 2009) (after circuit court vacated sentence and remanded, district court "flout[ed]" the "spirit of the mandate" by imposing a sentence only one month shorter than the original sentence).  After all, the Supreme Court and the en banc Ninth Circuit have repeatedly emphasized that district courts—not appellate courts—have substantial discretion and possess primary authority to determine what is a reasonable sentence.  *See Rita v. United States*, 551 U.S. 338, 357–58 (2007) (sentencing judge has greater familiarity with the individual case and individual defendant than the appeals court and is therefore in a superior position to find facts and judge their import); *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1173 (9th Cir. 2017) (en banc) ("Each guideline-application decision is ultimately geared toward assessing whether the defendant should be viewed as more or less culpable than other offenders in a given class.  In light of their experience sentencing defendants on a day-in-and-day-out basis, district courts possess an institutional advantage over appellate courts in making such culpability assessments.").  And again, this makes practical sense because district judges are more familiar with the "nuts and bolts" that go into making sentencing determinations, which "depend heavily upon an understanding of the significance of case-specific details"—matters over which district courts have an institutional advantage.  *Gasca-Ruiz,* 852 F.3d at 1172; *accord Koon*, 518 U.S. at 98 ("District courts have an institutional advantage over appellate courts in making [sentencing] determinations, especially as they see so many more Guidelines [sentences] than appellate courts do.").

Yet after carefully and respectfully studying the Mandates in these *Rodriguez* cases, I find it impossible to reconcile the holdings with other binding precedents, such as *Buford*, *Koon*, and *Gasca-Ruiz*.  These precedents encourage and direct me as a sentencing judge to draw on my knowledge of underlying facts, to apply my comprehensive experience with border drug

importation offenses, and to rely on my familiarity with the characteristic ways in which this offense is committed.  The conflict is that the Rodriguez Mandates, which I must dutifully follow, have interpreted and applied the § 3B1.2(b) factors in ways that largely disaffirm my "case specific" experience and foreclose me from relying on the "special competence" I have developed from presiding in dozens of drug importation trials and sentencing thousands of convicted drug importers.  Likewise, paying heed to the "spirit of the mandate," as I must, unmistakably bolsters the perception that both panel majorities favor a finding that these defendants—and presumably every other cross-border drug smuggler—should be deemed "minor participants."  *But see United States v. Hurtado*, 760 F.3d 1065, 1067 (9th Cir. 2014) ("[The] argument is essentially this: Just as all children in Lake Woebegone are above average, all drug couriers are, by definition, below average and entitled to the minor role reduction.  Like the district court, we reject that argument.").  If not by their letter, then certainly in spirit, the Mandates have usurped my trial-level sentencing discretion and replaced it with a diktat that "Defendants are minor drug smugglers and the district court shall so find."  I outline in greater detail below the incompatible interplay between complying with that injunction and applying my grounded experience and familiarity with border drug smuggling cases.

## I.    The Degree to Which the Defendant Understood the Scope and Structure of the Criminal Activity – U.S.S.G. § 3B1.2, comment. (n.3(C)(i))

The panel in Sandra Rodriguez's case determined that, because "Rodriguez only knew two participants by name and two others by description," this factor was indicative of minor role.  *S. Rodriguez Mandate*, 2021 U.S. App. LEXIS 38134, at *13.  The panel relied on *United States v. Diaz*, 884 F.3d 911, 917 (9th Cir. 2018), for this proposition.  In *Diaz*, the court observed that a minor participant "may be unable to identify other participants with specificity" and

1   this "tends to show that [the defendant] had minimal knowledge regarding the
2   scope and structure of the criminal operation."  884 F.3d at 917.

3          Context is important here.  Section 3B1.2(b) is not peculiar to border drug
4   smuggling cases, and the *Diaz* court's tentative language ("*may be unable to*
5   identify*"* and "*tends to show* . . . minimal knowledge") suggests that this factor
6   shouldn't be considered "one size fits all."  It *nominally* applies to every criminal
7   offense listed in the U.S. Code.  Supposing that average participants in criminal
8   activities can identify their co-participants may reasonably fit the characteristics
9   or modus operandi of many federal offenses.  But two decades of experience
10  has convinced me that the generality of this proposition doesn't fit most border
11  drug smuggling cases.

12         To those familiar and experienced with border drug smuggling, it is
13  axiomatic that the hierarchy of all major cross-border drug organizations
14  consciously and intentionally strives to keep drug smugglers in the dark.  Unlike
15  a conventional business where new employees begin their first day on the job
16  meeting coworkers, being introduced to supervisors, and leafing through the
17  company handbook to familiarize themselves with the corporate structure,
18  border drug smuggling organizations operate in guarded anonymity.
19  Awareness of the structure and inner-workings of the organization and
20  knowledge of those who control it is strictly on a need-to-know-basis.  The
21  reason for this is obvious: higher-ups won't chance being "ratted out" by
22  smugglers who run the greatest risk of being caught.  In this Court's broad
23  experience, it is unremarkable—in fact, *it is the norm*—that average border
24  //
25  //
26  //
27  //
28  //

drug smugglers are unable to identify other participants in a smuggling venture, save perhaps their immediate recruiters.[1]

Predicating a minor role finding on a drug smuggler's ability to identify other members of a cartel or to describe the scope and structure of the larger drug organization ignores the realities of border drug importation cases for another reason.  The Rodriguez Mandates broadly construe the phrase, "the criminal activity," used in the commentary to § 3B1.2(b), to conjure up the specter of an overarching, multinational drug organization of which the Rodriguez defendants were an insignificant part. No doubt such organizations exist, but to be clear, Sandra Rodriguez and Jesus Rodriguez pled guilty only to importing controlled substances in violation of 21 U.S.C. § 952(b).  The essential elements of that offense are simple and straightforward: (1) bringing a prohibited drug into the United States (the *actus reas*); (2) with knowledge of or willful blindness to its presence (the *mens rea*).  The simplicity of these elements distinguishes § 952(b) importation offenses from complex drug-related offenses such as RICO, 18 U.S.C. § 1961 *et eq*., and Continuing Criminal Enterprise ("CCE"), 21 U.S.C. § 848, which require proof of "exotic" elements, involve highly structured and regimented hierarchies, and depend on a multitude of participants to succeed.

An example illustrates the distinction.  Several years ago, I presided over the RICO prosecution of the infamous Arellano-Felix Organization ("AFO").  The AFO was one of seven major Mexican drug trafficking organizations and

---

[1]   Judge Van Dyke acknowledged this point in his concurrence in the J. Rodriguez Mandate, calling it an "unrealistic assumption" to believe that average smugglers are likely to know the scope and structure of the drug organization that employs them or to be able to identify other members working for a criminal cartel.  44 F.4th at 1238.  He explained: "[S]omeone running large quantities of drugs across the border understands 'the scope and structure of the criminal activity' well enough, regardless of whether he knows specifically the many other participating individuals."  *Id*. at n.1.

was considered the largest and most violent.  Peter Chalk, *Profiles of Mexico's Seven Major Drug Trafficking Organizations*, CTC Sentinel, Jan. 2012, at 5, https://ctc.westpoint.edu/profiles-of-mexicos-seven-major-drug-trafficking-organizations/.  I sentenced the three main defendants in the case—the Arellano-Felix brothers—as well as several lieutenants in the organization and many others with less significant roles.  I learned from handling the Arellano-Felix cases and numerous other complex border drug cases that major drug cartels are intricately organized and closely controlled.  Only those who are at or near the very top of these organizations are likely to know the scope and structure of the overall operation.  And if you're not part of that hierarchy—drug importers never are—then asking questions about the scope and structure of the organization arouses suspicion and is dangerous.  Drug smugglers well know that "inquiring minds" can lead to trouble.

The point here is that it is a mistake to conflate insular § 952(b) drug importation cases with other more complex drug offenses and to presume, as the Mandates do, that the case-specific aspects of these very different offenses are identical.  They are not.  Unlike the complicated and highly structured criminal operations carried out by an AFO-type organization, the average drug importation case typically involves a lone smuggler who crosses the border alone, neither knowing nor having the ability to specifically identify co-participants in the offense, and who has been deliberately shielded from awareness of the scope and structure of the organization that hired him.  While it may be accurate to characterize drug smugglers as minor participants in RICO or CCE cases, it is misguided to superimpose that generality onto importation cases.  In other words, not even adroit legal interpretation can transform the very basic elements of proof required under § 952(b) into a lesser-included offense of itself.

## II.  The Degree to Which the Defendant Participated in the Planning or Organizing of the Criminal Activity – U.S.S.G. § 3B1.2, comment. (n.3(C)(ii))

Both panels held this factor supported granting minor role because there was no evidence the defendants participated "in the planning of the plan," S. Rodriguez Mandate, 2021 U.S. App. LEXIS 38134 at *14, or in "devising the plan" or "developing the plan," J. Rodriguez Mandate, 444 F.4th at 1236. Handling thousands of drug importation cases has taught me that average drug smugglers rarely—if ever—plan, devise, or develop the drug smuggling plan in which they knowingly participate.  Instead, drug smugglers are invariably recruited to participate in a plan that was preconceived by organizers and other higher-ups—participants who likely qualify for an aggravated role adjustment under § 3B1.1.  Overgeneralizing this factor and establishing it as a touchstone for whether a border drug smuggler is deemed "average" or "substantially less than average" ignores this reality.

By construing the phrase, "participated in the planning," to require that a defendant must "devise," "develop," or "plan" the criminal activity, the Rodriguez Mandates are in tension with other Circuit case law and with § 3B1.1, which declares that "organizers" of criminal activity should be considered for an *aggravated* role and an *upward* adjustment of their Guidelines.  According to Circuit precedent, "[a] defendant 'organizes' other participants if he has 'the necessary influence and ability to coordinate the[ir] behavior . . . so as to achieve the desired criminal result[s].'" *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (quoting *United States v. Doe*, 778 F.3d 814, 826 (9th Cir. 2015)).  And a defendant can "organize" a single codefendant.  *Id*.  One who devises, develops, or plans criminal activity is unquestionably "influencing" and "coordinating" the behavior of co-participants to achieve the desired results.  But can it be correct that simply because a drug smuggler is not an "organizer"—because he "doesn't plan the planning"—he is

instead a "minor participant?"   If so, who qualifies as an average drug smuggler?

Interpreting words matters because whoever controls the meaning of words controls the conversation.  Here, the Mandates have strictly cabined the words "participated in the planning," to mean those who "plan the plan" or who "devise" or "develop" it.  The Oxford language dictionary (among several other definitional sources) takes a broader view of what it means to "participate." According to Oxford, to "participate" means to "take part in an action or endeavor." *Participate*, Oxford Languages (2022).  Correspondingly, Oxford defines "endeavor" as "an attempt to achieve a goal." *Endeavor*, *id.*

Consider Tom Brady, widely believed to be the best quarterback ever to play professional football.  Week in and week out during the NFL season, Brady studies his team's game plan for the upcoming game, runs familiar plays with teammates at daily team practices, and strategizes with coaches how to execute the game plan to score touchdowns.  Although Brady has masterful knowledge of the team playbook, understands the game plan, and knows the specific role he and each of his teammates must play during the game, he neither devised the playbook or developed the game plan, nor (barring an occasional audible) does he decide which play to run during the game.  That responsibility rests with the coaches who call in plays from the sideline or from a sky booth overlooking the field.  When the plays are relayed to Brady and his on-field teammates, they know exactly how to execute them because the game plan was explained beforehand and the players understood it and practiced the plays.  Acknowledging this division of responsibility, can it be said that Tom Brady doesn't participate in the game plan?  Or, tracking the rationale of the Mandates, is it accurate to describe Brady as a "minor participant" in the game because he didn't "plan the plan," or "develop" or "devise" it?

1   Now contrast this football analogy with the respective roles played by the

2   Rodriguez defendants in their drug smuggling ventures.

3   **A.   Sandra Rodriguez**

4   A month before she was arrested, Sandra Rodriguez agreed to

5   participate in a plot to smuggle drugs into the United States.  Presentence Rep.

6   at 3, *United States v. Rodriguez* (*Sandra Rodriguez*), No. 19-cr-3339-LAB-1

7   (S.D. Cal. filed Nov. 27, 2019), ECF. No. 25 (PSR 1).  A friend of hers, Martha,

8   who lived nearby her in Los Angeles, recruited her to participate and introduced

9   her to a man named Alejandro Ibarra.  *Id*.  Ibarra bought Rodriguez a car to

10  use to smuggle the drugs, and she permitted him to register it in her name.

11  Sent'g Tr. at 7–8, *Sandra Rodriguez*, No. 19-cr-3339-LAB-1 (S.D. Cal. hearing

12  held Jan. 6, 2020), ECF. No. 43 (ST 1).  Three weeks later, Rodriguez drove

13  her newly registered car from Los Angeles to the Plaza Sendero in Tijuana—a

14  distance of 151 miles.  At the plaza, she expected to meet to a man whom she

15  didn't know, understanding that she would turn the car over to him and he

16  would take it to another location where drugs would be hidden in it.  *Id*. at 8–9.

17  After turning the car over to the man, she waited several hours for him to return

18  to the Plaza, then reclaimed possession of the car, knowing it now contained

19  hidden drugs.  She then successfully crossed the drug load into the United

20  States.  *Id*.  For this she was paid $4,000.  *Id*. at 17.  These events occurred a

21  week *before* she was arrested for drug smuggling on August 3, 2019.

22  A week later Sandra Rodriguez tried it again.  This time her attempt was

23  foiled when a drug detection dog alerted to her car.  PSR 1 at 3.  Border guards

24  searched the car and discovered 21.6 kilograms (over 47 pounds) of pure

25  methamphetamine and 2.24 kilograms (almost 5 pounds) of heroin stashed in

26  non-factory compartments welded into the frame of the vehicle.  *Id*.  Sandra

27  Rodriguez admitted in a post-arrest statement that she expected to be paid an

28  additional $4,000.  She also revealed she had paid Martha a $500 "recruitment

1   fee" after her first successful drug smuggling trip and she intended to pay her
2   an additional $500 once she successfully crossed drugs this time.  *Id*.

3         **B.   Jesus Rodriguez**

4         About three years before his arrest on August 27, 2020, Jesus Rodriguez
5   was stopped at a highway checkpoint where Border Patrol agents discovered
6   more than 4 kilograms of a controlled substance hidden in his car.
7   Presentence Rep. at 6, *United States v. Rodriguez* (*Jesus Rodriguez*), No. 20-
8   cr-2911-LAB-1 (S.D. Cal. filed Jan. 1, 2021), ECF. No. 27 (PSR 2);
9   Sent'g Tr. at 6, *Jesus Rodriguez*, No. 20-cr-2911-LAB-1 (S.D. Cal. hearing
10  held May 3, 2021), ECF No. 43 (ST 2).  He pled guilty to transporting a
11  controlled substance and was sentenced to seven years in prison, although he
12  served only three.  PSR 2 at 12.  He was on mandatory supervision for his
13  previous drug trafficking offense when he was arrested in this case.  *Id*.

14        Two weeks before he was arrested, Rodriguez met a man named
15  "Gordo" at a party.  *Id*. at 3–4.  Gordo had overheard Rodriguez talking about
16  finding a job and asked Rodriguez if he'd be willing to smuggle drugs from
17  Mexico into the United States.  *Id*. at 4.  Rodriguez told Gordo he'd have to
18  think about it and the two exchanged contact information.  *Id*.

19        Two or three days later, Gordo and Rodriguez spoke again.  This time,
20  Rodriguez told Gordo he would accept the job.  Gordo explained to Rodriguez
21  that he would be given a load vehicle containing drugs to drive from Mexico
22  into the U.S. and that he would be paid $2,000 to $3,000 once he successfully
23  crossed the drugs.  *Id*.  Approximately a week later, Gordo notified Rodriguez
24  that the load car was ready.  *Id*.

25        On the day of his arrest, Rodriguez had driven from Perris, California to
26  a hotel in Tijuana where the drug-laden car was turned over to him.  ST 2 at 7.
27  According to Rodriguez, the plan was for Gordo to call him with specific
28  instructions where to deliver the drugs once he crossed into the United States.

*Id.* at 5.  But the plan was upended when Rodriguez was detained at the port of entry by a border guard who found drug packages under a rug in the trunk of the car.  In secondary inspection, border agents discovered 40.84 kilograms (almost 90 pounds) of pure methamphetamine stuffed into the car's quarter panels, doors, spare tire, gas tank, and rear seat.  *Id.* at 3.

\* \* \* \* \*

In both Rodriguez cases, the defendants knew the essential details of the drug smuggling plan *before* they agreed to participate.  Sandra Rodriguez, for example, was told that the car she would be given had to be registered in her name.  This is a common tactic in border drug smuggling, designed to allay suspicion by border guards.  Presumably, she was aware of this purpose and willingly provided her personal information to Ibarra so he could list her as the registered owner.

At sentencing, her lawyer explained that when she was arrested, she was again working with Ibarra, following the same *modus operandi* as the week before when she successfully smuggled drugs, driving the same car she had permitted Ibarra to register in her name, and planning to deliver drugs to the same person to whom she had previously delivered drugs.  ST 1 at 4.  In other words, with a full understanding of the "game plan," which she had practiced, Rodriguez attempted to execute the plan a second time.  I'm no linguist, but it's hard to decipher why such deliberate, informed conduct doesn't amount to "participation in the planning" of the smuggling venture.

As for Jesus Rodriguez, having previously been caught at a highway checkpoint transporting drugs, he had experienced first-hand the risk of attempting to drive a drug-laden car past a point where law enforcement checks are performed.  At the border, the risks include running the gauntlet of border guards who patrol the pre-primary area aided by reliable drug-sniffing

1   dogs.  If a drug smuggler makes it to the primary inspection booth without
2   detection, he'll confront, face-to-face, a suspicious border guard whose duty is
3   to prevent drugs from entering the U.S.  The guard has unlimited authority to
4   inspect any car.  These well-known risks probably explain why Rodriguez
5   initially parried Gordo's offer, saying he needed to "think about it."

6          A district court's findings are to be upheld as long as they aren't illogical,
7   implausible, or without support in inferences that may be drawn from the facts.
8   *United States. v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).
9   When I sentenced Jesus Rodriguez, I reasonably deduced from the known
10  facts of his initial encounter with Gordo that: (1) they discussed a plan to
11  smuggle drugs across the border; (2) they very likely discussed and possibly
12  negotiated the fee that would be paid (unless he was to be paid, why would
13  Rodriguez even consider the plan or need to think about it?); and (3) Rodriguez
14  had a clear understanding of what his anticipated role would be if he agreed to
15  participate in the plan.

16         Rodriguez's delay in deciding whether to participate gave him time to
17  contemplate and reflect on the plan, and to consider the risks it posed.  I found
18  that his eventual decision to become involved in the drug smuggling plan was
19  fully considered and premeditated—mental states that the criminal law has
20  historically regarded as indicative not of minor participation but rather of a high
21  level of criminal culpability.  *See e.g.*, *Enmund v. Florida*, 458 U.S. 782, 800
22  (1982) ("American criminal law has long considered a defendant's intention—
23  and therefore his moral guilt—to be critical to 'the degree of [his] criminal
24  culpability . . .'") (cleaned up); *see also Deliberate*, Black's Law Dictionary
25  (8th ed. 2004) (defining a deliberate action as one that is "[i]ntentional;
26  premeditated; fully considered").

27         Pursuant to the plan, Rodriguez drove from Perris, California to a hotel
28  in Tijuana to meet Gordo, a distance of approximately 98 miles.  PSR 2 at 4;

1  ST 2 at 8.  There, as he anticipated, he took possession of the drug-laden car
2  and drove to the border, expecting to receive a phone call providing additional
3  direction once he crossed.  PSR 2 at 4.  None of the actions Rodriguez took
4  were forced or coerced—he had volunteered.  Well before he was caught
5  smuggling drugs at the border, Jesus Rodriguez knew the plan, knew his role
6  in the plan, and took action to execute the plan.

7      As was true of the Rodriguez defendants, my experience is that average
8  border drug smugglers in every case are thoroughly briefed on the actions they
9  must take for the smuggling plan to succeed.  The plan often contemplates
10 their participation in various preparatory acts, such as registering smuggling
11 vehicles in their names (or allowing others to do so), driving long distances,
12 making "dry runs" across the border to establish a crossing pattern in a
13 particular vehicle and also to familiarize smugglers with the scrutiny they can
14 anticipate from border guards, and memorizing detailed instructions such as
15 where they must go and what they must do once they successfully cross the
16 border.  But because I must follow the letter and the spirit of the Mandates—
17 which, to reiterate, require importers to "plan," "devise" or "develop" the drug
18 smuggling plan"—I am foreclosed from relying on my own entrenched
19 experience to decide whether the evidence proves the Rodriguez defendants
20 "participated in the planning."  According to the Mandates, they did not.

21     The Mandates emphasized another factor that the panel majorities
22 considered consequential to a finding of minor role: both Rodriguez defendants
23 claimed to be unaware of the type or quantity of drugs they were smuggling.
24 S. Rodriguez Mandate, 2021 U.S. App. LEXIS 38134 at *14–15; J. Rodriguez
25 Mandate, 44 F.4th at 1236.  My experience—again, in handling thousands of
26 border importation cases—is that drug smugglers seldom know or care to know
27 the type or quantity of drugs they are smuggling.  To the contrary, they are
28 either indifferent to knowing such information or they *deliberately don't want to*

*know*.  Having listened to sentencing allocutions from hundreds of border drug smugglers, I've learned that the most important consideration to a smuggler is money—how much he will be paid.  Money is so paramount that a smuggling plan could call for bringing in nuclear waste and, for the right price, average drug smugglers would bite.   Here, for example, although both Rodriguez defendants had discussed money with their recruiters and knew how much they would be paid, neither bothered to ask about the type or quantity of the drugs they would be smuggling.  ST 1 at 11; PSR 2 at 4.  Sandra Rodriguez's detachment went further—she *deliberately avoided knowing* the type and quantity of her drug loads.  ST 1 at 11 (counsel for Sandra Rodriguez describing her as "willfully ignorant" of the type and quantity of her drug loads); *cf. United States v. Heredia*, 483 F.3d 913, 924 (9th Cir. 2007) (en banc) (defendant's awareness of a high probability of criminality and deliberate avoidance of learning the truth is tantamount to actual knowledge).

Here again, notwithstanding my every-day observations and understanding of the case-specific details of border drug smuggling cases, *Gasca-Ruiz*, 852 F.3d at 1173, and the "special competence" I have developed in handling a myriad of these cases, *Buford*, 532 U.S. at 64, I am stymied by the letter and spirit of the Mandates.  Rather than relying on my validated experience, the rule of mandate forces me to ratify an irreconcilable assumption that average drug smugglers usually know—or should know—the type and quantity of the drugs they import.

//

//

//

//

//

//

### III.   The Degree to Which the Defendant Stood to Benefit from the Criminal Activity – U.S.S.G. § 3B1.2, comment. (n.3(C)(v))

The Rodriguez Mandates held this factor favored a finding of minor role because Sandra Rodriguez was to receive $4,000[2] and Jesus Rodriguez was to receive between $2,000 and $3,000.  The Mandates characterized these amounts as "modest and fixed," but offered no guidance as to what amount of compensation would disqualify a drug smuggler from being considered a minor participant.  Again, I cannot reconcile my experience in sentencing thousands of border drug smugglers with this characterization and conclusion.

I learned long ago in my law school contracts class that the fair market value of something, whether goods or labor, was the price that was agreed to between a willing seller and a willing buyer.  The usual or "going" rate per trip for smuggling large quantities of controlled substances across the border into the Southern District of California is between $1,000 at the low end and $8,000 to $10,000 at the very high end.  These figures aren't speculative.  They are empirical and verified by my extensive experience sentencing "willing

---

[2]   In determining Sandra Rodriguez's sentence, I concluded her fee for smuggling drugs was $8,000 because she had received $4,000 for smuggling drugs the first time and expected to receive another $4,000 had she not been arrested the second time.  According to the Mandate, the $8,000 figure was wrong because only $4,000 was promised for the drug load for which she was arrested and sentenced.  S. Rodriguez Mandate, 2021 U.S. App. LEXIS 38134 at *23, n.5.  This holding is contrary to U.S.S.G. § 1B1.3(a)(1)(A)–(B) (Relevant Conduct), which directs district courts to consider "all acts" committed by the defendant that are "within the scope of jointly undertaken criminal activity," which is further defined as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others."  It is undisputed that both times Sandra Rodriguez smuggled drugs, she was working with Ibarra, following the same *modus operandi*, driving the same car, intending to deliver the drugs to the same person, etc.  ST 1 at 4.  Here again, the rule of mandate poses a conflict with other controlling legal authority by requiring that I ignore § 1B1.3(a)(1)(A)–(B) and adopt the panel's conclusion that Sandra Rodriguez's drug smuggling fee was only $4,000.

smugglers."  Judges, prosecutors, and criminal defense lawyers in this District who handle border drug smuggling cases on a daily basis will attest to their accuracy.  The smuggling fees promised to both Rodriguez defendants fell within this well-established range.

The Mandates rebuffed my first-hand experience, minimizing the amount of the fees the Rodriguez defendants agreed to accept by characterizing them as "modest and fixed."  But considering the substantial deference the Supreme Court has said is owed to district courts, should my finding of the fair market value of a negotiated service between a willing buyer and seller—neither being under any compulsion to buy or sell and both having full knowledge of the relevant facts—have been so cavalierly disregarded?  If so, what fee amount exceeding the limits of reason or necessity must be paid for a drug smuggler to be regarded as "average?"  The Mandates don't say, although they're clear that fees between $2,000 and $4,000 are insufficient.

While rejecting case-specific experience relating to the common amount of fees paid to drug smugglers, the Rodriguez Mandates rely on a metric that compares the value of a smuggler's fee to the value of the drug load being smuggled.  The mathematics of this metric are easy enough to understand, but drawing on my experience I am unaware of any meaningful rationale to explain how this method of comparison applies to border drug smuggling cases.  Just the opposite: I know from hard-won experience that there is no relevant or comparable relationship between the high value of bulk narcotics and the much lower value fee that will induce someone to smuggle them.  The lack of comparability is unremarkable and understandable to those familiar with the nuances of border drug smuggling because, as I have pointed out, border drug smugglers are invariably *indifferent* to the type and amount of drugs they smuggle.

Analogies to buttress this point abound.  Armored truck guards transport millions of dollars of bonds, currency, and jewelry in heavily fortified trucks, but their pay isn't tied to the value of their cargo.  Nor does the compensation of a jewelry salesperson bear any relationship to the value of the gold, silver, and diamond jewelry in the showcase he or she oversees.  And stadium hot dog venders, as far as I know, aren't entitled to a percentage of the gate receipts from the World Series.  In each of these examples, just as with drug value and drug smugglers' fees, there is no meaningful, experientially-based interrelationship that applies.  Nevertheless, I am bound by the Mandates to apply this metric.

Finally, the Mandates also held that because the Rodriguez defendants didn't own the drugs they were smuggling, that too supported granting them minor roles.  While I acknowledge that the commentary to § 3B1.2(b) mentions having a "proprietary interest in drugs" as a factor, I know from experience that it has absolutely no relevance or application to border drug smuggling cases.  *See United States v. Gutierrez-Sanchez*, 587 F.3d 904, 908 (9th Cir. 2009) ("The weight to be given the various factors in a particular case is for the discretion of the district court.").  Trying to apply it is akin to the proverbial effort to fit a square peg in a round hole.  In disposing of thousands of "border bust" cases, I have *never* encountered a single instance in which a cross-border drug smuggler owned all, or any part of, a bulk drug load.

My experience mirrors that of experienced prosecutors and defense attorneys who practice in this District.  In countless border drug smuggling cases when the issue of "proprietary interest in the drugs" has been raised, I have asked whether either counsel has ever handled a case where the smuggler owned the large load of drugs being smuggled.  Without exception, the answer has been "no."  It never happens.  Why?  Because drug traffickers with the wherewithal to own and control large quantities of drugs won't take the

risk of crossing drugs themselves.  Despite the certainty and uniformity of my experience that this factor has zero application in border smuggling cases, I must construe it in favor of finding minor role.[3]

## IV.    Recusal is Warranted and Necessary in Cases of Conflict or When a Judge is Unable to Follow the Law

Over a hundred years ago, Oliver Wendell Holmes discerned that "[t]he life of the law has not been logic: it has been experience."  Oliver Wendell Holmes, Jr., The Common Law 1 (1881).  Holmes' wisdom is embodied in the relevant federal sentencing statute that requires a reviewing court not only to "accept" a district court's "findings of fact" (unless "clearly erroneous"), but also to "give due deference to the *district court's application of the guidelines to the facts*." 18 U.S.C. § 3742(e) (emphasis added).  The Supreme Court has also embraced this principle, pointing out that deference may depend on whether "one judicial actor is better positioned than another to decide the issue in question," *Miller* v. *Fenton,* 474 U.S. 104, 114 (1985), and adding that the deference due depends on the nature of the question presented, *Koon*, 518 U.S. at 98.   Where the question embodies the kind of discretion traditionally exercised by a sentencing court—*i.e.*, making findings concerning a defendant's role in an offense and level of culpability—the judgment is entitled to *substantial* deference.   *Id*.  Substantial deference is especially appropriate when factual nuances may closely guide the legal decision to be

---

[3]  The Supreme Court's decision in *Kimbrough v. United States*, 552 U.S. 85 (2007), authorizes district judges "to impose sentences reflecting their policy disagreements with the Guidelines," in cases in which empirical evidence doesn't support the application of a particular provision of the Guidelines. *United States v. Gonzalez-Zotelo*, 556 F.3d 736, 739 (9th Cir. 2009).  However, *Kimbrough* doesn't permit me to flout the law of the case or the rule of mandate doctrines.  Both doctrines here again require me to apply a factor in an abstract manner that is contrary to my knowledge and experience with "case specific details" in border drug smuggling cases.  *Cf. Koon*, 518 U.S. at 99.

1  made, or where the legal result depends heavily on an understanding of the

2  significance of case-specific details that have been gained through experience

3  with trials and sentencings.  *Buford*, 532 U.S. at 64–65.  This is precisely the

4  kind of determination that must be made in resentencing Sandra and Jesus

5  Rodriguez.

6  The Mandates arrived at the judgment that two practiced drug traffickers,

7  who consciously and intentionally joined plans to import bulk quantities of

8  methamphetamine and heroin into the United States, and who were promised

9  thousands of dollars in payment for their participation, qualify as "minor

10  participants" in the offense of simple drug importation.  My twenty-five years of

11  grounded, trial-level experience handling border drug smuggling cases

12  opposes the logic and impact of that conclusion.

13  "It is a general principle of federal sentencing law that district courts have

14  a duty to explain their sentencing decisions."  *United States v. Emmett*,

15  749 F.3d 817, 820 (9th Cir. 2014) (citing *United States v. Carty*, 520 F.3d 984,

16  992–93 (9th Cir. 2008) (en banc).  This requirement helps reinforce "the

17  public's trust in the judicial institution," *Rita v. United States*, 551 U.S. 338, 356

18  (2007), and demonstrate "that a reasoned decision has been made," *Carty*,

19  520 F.3d at 992.  In this Order, I have attempted to explain why I continue to

20  believe and would find that the Rodriguez defendants are "average" border

21  drug smugglers—no better, no worse.  But my explanation and probable

22  findings—even if not expressly precluded by the law of the case and the rule

23  of mandate—are most certainly inconsistent with the expansive "spirit" of the

24  Mandates, which unsubtly bespeaks the desired conclusion of the court of

25  appeals.  The Ninth Circuit has said that in situations like this, where the

26  original sentencing judge on remand would "have substantial difficulty in

27  putting out of his or her mind previously-expressed views or findings

28  determined to be erroneous," the judge should recuse.  *United States v. Arnett*,

628 F.2d 1162,1165 (9th Cir. 1979).  Because I find myself unable to brush aside my insights, experience, and long-held conclusions about what "average" border drug smugglers know and how they operate, I respectfully recuse from further involvement in these cases.

The Clerk of the Court is directed to randomly reassign these cases to a different district judge of this Court.

**IT IS SO ORDERED**.

Dated: November 15, 2022

**HON. LARRY ALAN BURNS**
United States District Judge